# EXHIBIT 1

OPERATING AGREEMENT OF
CONCORDE APPAREL COMPANY, L.L.C.
A DELAWARE LIMITED LIABILITY COMPANY
EFFECTIVE AS OF August 25, 1994

WHEREAS, Straight A Company ("Straight A") is a Pennsylvania limited partnership having an office at One Maxson Drive, Old Forge, Pennsylvania 18518; and

WHEREAS, LA Apparel, Inc. ("LA") is a New York corporation having an office at 1290 Avenue of the Americas, New York, New York, 10104; and

WHEREAS, LA is engaged primarily in the business of marketing men's apparel products; and

WHEREAS, the parties desire to form a limited liability company under the Delaware Limited Liability Company Act to engage in the business of styling and marketing a line of domestically produced and imported men's clothing products, including suits, sportcoats, overcoats and raincoats and other apparel as may be mutually agreed to by the Members under the terms and conditions herein set forth;

NOW THEREFORE, in consideration of the covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

### Definitions

1.01.   Definitions.   The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

      a.    "Capital Account" as of any given date shall mean the Capital Contribution to the Company by a Member as adjusted up to the date in question pursuant to Article VII.

      b.    "Capital Contribution" shall mean any contribution to the Capital of the Company in cash or property (at an agreed value) by a Member whenever made.   "Initial Capital Contribution" shall mean the initial contribution to the capital of the Company pursuant to this Operating Agreement.

      c.    "Capital Interest" shall mean the proportion that a Member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances as may be adjusted from time to time.

      d.    "Certificate of Formation" shall mean the Certificate of Formation of Concorde Apparel Company, L.L.C., as filed in the Office of the Secretary of the State of Delaware as the same may be amended from time to time.

2.

e.      "Company" shall refer to Concorde Apparel Company, L.L.C.

f.      "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of either the fiscal year or the taxable year, after giving effect to the following adjustments:

i.  Credit to such Capital Account any amount which such Member is obligated to restore under Treas. Reg. 1.704-1(b) (2) (ii) (c), as well as any addition thereto pursuant to the next to last sentence of Treas. Reg. 1.704-2(g)(l) and (i) (5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Treas. Reg. 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Treas. Reg. 1.704-2(i)3)); and

ii.  Debit to such Capital Account the items described in Treas. Reg. 1.704-1(b) (2) (ii) (d) (4), (5) and (6).

iii.  This definition of Deficit Capital Account is intended to comply with the provision of Treas. Reg. 1.704-1 (b) (2) (ii) (d) and 1.704-2, and will be interpreted consistently with those provisions.

3.

g.     "Delaware Act" shall mean the Delaware Limited Liability Company Act, 6 Del. Code 18-101, et. seq.

h.     "Distribution Cash" means all cash, revenues, and funds received by the Company from Company operations less the sum of the following to the extent paid or set aside by the Company:

i.   All principal and interest payments on indebtedness of the Company and all other sums paid to lenders;

ii.  All cash expenditures incurred incident to the normal operation of the Company's business;

iii. Such Reserves as the Members deem reasonably necessary to the proper operation of the Company's business.

i.     "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Operating Agreement and the Delaware Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision of the Members.

j.     "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

4.

k.      "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust business trust, cooperative or association, or any foreign trust, or foreign business organization.

l.      "Fiscal Year" shall mean the Company's fiscal year, which shall be the period ending June 30, each year. Notwithstanding the foregoing, for income tax purposes the Company's tax year will end on December 31 each year, which is hereinafter referred to as the Company's "taxable year" or "tax year".

m.      "IRC" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

n.      "Majority Interest" shall mean one or more Membership Interests which taken together exceed 50 per cent of the aggregate of all Capital Contributions under section 7.01 below.

o.      "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members.  If a Person is a Member immediately before the purchase or other acquisition by such Person of an Economic Interest, that Person shall have all the rights of a Member with respect to the purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

5.

p.    "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Delaware Act.

q.    "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the accrual method of accounting at the close of each fiscal year on the Company's financial statements.

r.    "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

s.    "Persons" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of the "Person" when the context so permits.

t.    "Reserves" shall mean, for any fiscal period, funds set aside or amounts allocated during such period to reserves that shall be maintained in amounts deemed sufficient by the Members for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business.

6.

u.      "Treasury Regulations" shall include proposed, temporary, and final regulations promulgated under the IRC in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede those regulations.

## ARTICLE II
### Formation of Company

2.01.   <u>Formation.</u>   On or about August 25, 1994, James Alperin and Lee Wattenberg organized a Delaware Limited Liability Company by executing and delivering Articles of Organization to the Delaware Secretary of State in accordance with and pursuant to the Delaware Act.

2.02.   <u>Name.</u>   The name of the Company is Concorde Apparel Company, L.L.C.

2.03.   <u>Principal Place of Business.</u>   The principal place of business of the Company shall be 300 Brook Street, P.O. Box 3627, Scranton, Pennsylvania 18505-3627.   The Company may locate its places of business and registered office at any other place or places as the Members may from time to time deem advisable.

2.04.   <u>Registered Office and Registration Agent.</u>   The Company's initial registered office shall be at the office of its registered

7.

agent, and the name of its initial registered agent and its address shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange, Wilmington, Delaware. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Delaware Act.

2.05.  <u>Term.</u>  The term of the Company shall be until the Company is dissolved in accordance with either the provisions of this Operating Agreement or the Delaware Act, but in any event not later than thirty (30) years after the formation date unless a longer period is allowed by law.

ARTICLE III

Business of Company

3.01.  <u>Permitted Businesses.</u>  The business of the Company shall be:

a.      To style and market a line of domestically produced and imported mens clothing products, including suits, sportcoats, overcoats and raincoats and other apparel as may be mutually agreed to by the Members.

8.

b.      To exercise all other powers necessary to or reasonably connected with the Company's business that may be legally exercised by limited liability companies under the Delaware Act.

c.      To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE IV

### Names and Addresses of Members

The names and addresses of the Members are as follows:

| Name | Address |
|------|---------|
| Straight A Company, a Pennsylvania Limited Partnership | One Maxson Drive Old Forge, PA  18518 |
| LA Apparel, Inc., a New York Corporation | 1290 Avenue of the Americas Suite 1555 New York, NY  10104 |

## ARTICLE V

### Rights, Obligations and Duties of Managers

5.01.  <u>Management.</u>  The business and affairs of the Company shall be managed by its Managers.  The Managers shall direct, manage, and control the business of the Company to the best of their ability and will devote sufficient time and energy to the operation of the

9.

Company to cause it to operate effectively.

5.02.  Number, Tenure, Qualifications.  The Company shall have two Managers and each of the two Members shall nominate one Manager. Each Manager shall hold office until the next annual meeting of Members or until a successor shall have been elected or qualified. Managers shall be appointed by the unanimous vote of the Members. Managers need not be residents of the State of Delaware.  Straight A hereby nominates James Alperin and LA hereby nominates Lee Wattenberg and such nominees are hereby unanimously appointed.

5.03.  Certain Powers of Managers.  Notwithstanding section 5.01, the Managers shall have the authority to do the following only if they both concur:

a.     Except as set forth in (i) below, to acquire property from any Person as the Managers may determine.  The fact that a Manager or Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Managers from dealing with that Person, provided such affiliation or connection has been disclosed;

b.     To borrow money for the Company from banks, other lending institutions, Managers, Members, or affiliates of Managers or Members, on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the

10.

borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company except by the Managers, or to the extent permitted under the Delaware Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Members;

      c.     To purchase liability and other insurance to protect the Company's property and business;

      d.     To hold, own, and acquire any real and/or personal properties in the name of the Company;

      e.     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper, or other investments;

      f.     With the written consent of both Members, to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long as that disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

      g.     Upon the signature of both Managers, to execute on behalf of the Company all instruments and documents, including, without limitation: drafts; notes and other negotiable instruments, mortgages, or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale;

11.

leases; partnership agreements; operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company;

      h.     To hire executive level employees and to employ accountants, legal counsel, managing agents, or other experts to perform services for the Company and to compensate them from Company funds.  This applies to any employee having an executive title with the Company.

      i.     To enter into any and all other agreements (other than purchase orders which need only be signed by a single Manager) on behalf of the Company, with any other Person for any purpose, in such form as the Managers may approve.

5.04.  a.  Except as provided in section 5.03 each Manager shall have the power and authority to do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

      b.     Unless authorized to do so by this Operating Agreement, or by the Members or Managers of the Company, no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

5.05.  <u>Activities and Responsibilities of Managers.</u> The Managers shall perform their managerial duties in good faith, in a manner they

12.

reasonably believe to be in the best interests of the Company.  A
Manager shall not be liable to the Company, another Manager or any
Member for any loss or damage sustained by such Company, Manager or
Member, unless the loss or damage shall have been the result of
fraud, deceit, gross negligence, willful misconduct, or a wrongful
taking by the Manager.

The Manager nominated by LA shall devote substantially all of
his business time and attention to the management of the Company;
provided, however, that he shall be permitted to devote an immaterial
amount of time to businesses, included the business of licensing
tradenames and trademarks in the apparel industry, that do not
directly compete with the Company; and that he may have a financial
interest in any entity in which he does not have a controlling
interest or engage in management activities, provided such entity
does not directly compete with the Company.

The Manager appointed by Straight A Company is engaged in other
apparel manufacturing activities and businesses and shall continue to
be authorized to do so.  The said Manager shall not incur liability
to the Company or to any other Manager or Member as a result of
engaging in any other business or venture.

5.06.  <u>Bank Accounts.</u>  The Managers may from time to time open
bank accounts in the name of the Company, and the Managers shall,
except as herein set forth, be the sole signatories thereon, unless

13.

the Members, by unanimous vote, determine otherwise.  The signatures of both Managers will be required on all checks, drafts, or withdrawals therefrom. Notwithstanding the foregoing, a Manger can sign checks without the other Manager's signature for prior approved purchase orders or other invoices or bills pre-approved by the other Manager.

5.07.  Removal.  A Manager may be removed at any time by the Member who nominated him.

5.08.  Indemnity of the Managers, Employees and Other Agents. To the maximum extent permitted under Section 18-108 of the Delaware Act, the Company shall indemnify the Managers.  The Company shall indemnify its employees and other agents who are not Managers to the fullest extent permitted by law, provided that the indemnification in any given situation is approved by the unanimous vote of the Members.

5.09 Vacancies.  In the event of a vacancy occurring for any reason in the number of Managers of the Company, the Member whose nominee has ceased to serve shall nominate a successor, whose appointment shall be subject to the unanimous vote of the Members.

14.

ARTICLE VI

Rights, Obligations and Duties of Members

6.01.   <u>Limitation of Liability.</u>  Each Member's liability shall be limited as set forth in this Operating Agreement, the Delaware Act, and other applicable law.

6.02.   <u>Company Debt Liability.</u>  A Member will not be personally liable for any debts or losses of the Company beyond the Member's respective Capital Contributions and any obligation of the Member under section 8.01 below to make Capital Contributions, except as provided in section 6.06 below or as otherwise required by law.

6.03.   <u>Approval of Sale of All Assets.</u>  The Members shall have the right, by the unanimous vote of all Members, to approve the sale, exchange, or other disposition of all, or substantially all, of the Company's assets (other than in the ordinary course of the Company's business) which is to occur as part of a single transaction or plan.

6.04.   <u>Company Books.</u>  In accordance with section 9.10 below, the Members shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents.  Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy those company documents at the Company's expense.

15.

6.05.  <u>Priority and Return of Capital.</u>  Except as may be
expressly provided in Article IX, no Member or Economic Interest
Owner shall have priority over any other Member or Economic Interest
Owner, either for the return of Capital Contributions or for Net
Profits, Net Losses, or distributions; provided that this section
shall not apply to loans (as distinguished from Capital
Contributions) which a Member has made to the Company.

6.06.  <u>Liability of a Member to the Company.</u>  A Member who
receives any distribution from the Company shall be liable to the
Company for such distribution only to the extent required by Section
18-607 of the Delaware Act or as otherwise provided by law.

6.07.  <u>Duties of Managers.</u>  All Managers shall be responsible
for the management of the Company; provided, however, that

a.       James Alperin shall be solely responsible for and
Straight A or, if designated by Straight A, Alperin, Inc., shall bear
all costs and expenses of shipping and administration, and  shall
perform all customary and necessary services in connection therewith
and as set forth in Exhibit A hereto.  It is intended that Straight A
shall delegate its responsibilities to Alperin, Inc. and/or other
providers of these services.  However, until such time that Straight
A and LA are receiving payments of gross operating profit reflecting
allocations thereof pursuant to section 9.03(v), James Alperin shall

16.

not be responsible for writing cutting tickets and piece goods purchase follow up.

      b.     Lee Wattenberg shall be solely responsible for, and LA shall bear all costs and expenses of, the sales and marketing and shall perform all customary and necessary services in connection therewith and as set forth on Exhibit A attached hereto.   In addition, until such time that Straight A and LA are receiving payments of gross operating profit reflecting allocations thereof pursuant to section 9.03(v), he shall be specifically responsible for writing cutting tickets and piece goods purchase follow up.

      c.     The Members jointly shall be responsible for decision-making regarding purchases and corporate administration matters and necessary services in connection therewith as set forth on Exhibit A attached hereto.

      d.     Neither Straight A nor LA shall receive any payment or reimbursement for the foregoing services except as provided in section 9.03.

      e.     In no event will either of the named individual Managers have any personal liability for the expenses to be borne by their related Member.

17.

ARTICLE VII

Meetings of Members

7.01.  Annual Meeting.  The annual meeting of the Members shall be held on the first business day in the month of April or at such other time as shall be determined by resolution of the Members.

7.02.  Special Meetings.  Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Member, upon ten (10) days notice to all Members.

7.03.  Place of Meetings.  The Members may designate any place, either within or without the State of Delaware as the place of meeting for any meeting of the Members which is mutually convenient. If an agreement cannot be reached, or if a special meeting be otherwise called, the place of meeting shall alternate between New York City, New York and Scranton, Pennsylvania.

7.04.  Notice of Meetings.  Except as provided in section 7.05 below, written notice stating the place, day, and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered no fewer than ten (10) days before the date of the meeting, either personally or by certified mail, by or at the direction of the Members or person calling the meeting, to each Member entitled to vote at the meeting.  If mailed, the notice shall be deemed to be delivered two calendar days after being deposited in the United

18.

States mail, addressed to the Member at the Member's address as it appears on the books of the Company, with postage thereon prepaid.

7.05. <u>Meeting of All Members.</u> If all of the Members shall meet at any time and place, either within or outside of the State of Delaware, and consent to the holding of a meeting at the time and place, the meeting shall be valid without call or notice, and at the meeting lawful action may be taken.

7.06. <u>Record Date.</u> For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or Members entitled to receive payment of any distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring the distribution is adopted, as the case may be, shall be the record date for the determination of Members.

7.07. <u>Voting.</u> Each Member's vote shall be proportionate to its Capital Interest as reflected at the end of the previous fiscal year.

7.08. <u>Attendance.</u> All Members, represented in person or by proxy, must be present at any meeting of Members.

7.09. <u>Manner of Acting.</u> The majority vote of all Members shall be the act of the Members, unless the vote of a lesser proportion or number is otherwise required by this Operating Agreement or upon resolution of the Members. Unless otherwise expressly provided in this Operating Agreement or required under applicable law, Members

19.

who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their vote, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

7.10.  <u>Proxies.</u>  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  The proxy shall be filed with the other Members of the Company before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.

7.11.  <u>Action by Members Without a Meeting.</u>  Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all Members and included in the minutes or filed with the Company records.

7.12.  <u>Waiver of Notice.</u>  When any notice is required to be given to any Member, a waiver of the notice in writing signed by the person entitled to the notice, whether before, at or after the time stated therein, shall be equivalent to the giving of the notice.

20.

## ARTICLE VIII

### Contributions to the Company
### and Capital Accounts

8.01.  <u>Members' Capital Contributions.</u>  Each Member shall contribute as its Initial Capital Contribution $175,000 in cash and shall advance $200,000 to be evidenced by demand obligations to the Company (requiring a minimum of 13 months notice prior to repayment and requiring repayment pari passu with all such obligations) and shall execute general subordination agreements in favor of all creditors of the Company and shall collateralize the lending agreement with the Company's factor or other lending institution with $125,000 of cash or marketable securities which will at all times equal or exceed $125,000 in market value.  Upon making their respective Initial Capital Contributions, each Member's share of Capital Interest shall be as follows:

| | |
|---|---|
| Straight A Company | 50% |
| LA Apparel, Inc. | 50% |

8.02.  <u>Capital Accounts.</u>  A separate Capital Account shall be maintained for each Member.

    a.  Each Member's Capital Account will be increased by:

        i.  The amount of money contributed by the Member to the Company including amounts repaid by LA

21.

under section 9.04(b);

      ii.   The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC 752);

      iii. Allocations to the Member of gross profit under section 9.03 and Net Profits and Net Losses; and

      iv.   Allocations to the Member of income described in IRC 705(a) (1) (B).

b.    Each Member's Capital Account will be decreased by:

      i.   The amount of money distributed to the Member by the Company under section 9.04;

      ii.   The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under IRC 752);

      iii. Allocations to the Member of expenditures described in IRC 705(a) (2) (B); and

22.

iv.   Allocations to the account of the Member of Net Losses as set forth in the relevant Treasury Regulations, taking into account adjustments to reflect book value; and

v.   Any judgments against the Company as a result of an individual obligation assessed against only one of the members.

c.   In the event of a permitted sale or exchange of a Membership Interest or Economic Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Treas. Reg. 1.704-1(b) (2) (iv).

d.   The manner in which Capital Accounts are to be maintained pursuant to this section 8.02 is intended to comply with the requirements of IRC 704(b) and the Treasury Regulations promulgated thereunder.  If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this section 8.02 should be modified to comply with IRC 704(b) and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this section 8.02, the method in which Capital Accounts are

23.

maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

       e.     Upon liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within 60 days of the end of the taxable year (or, if later, within 120 days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to the Member.

       f.     Except as otherwise required in the Delaware Act, no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

   8.03.  <u>Withdrawal or Reduction of Members' Contributions to Capital.</u>  A Member shall not receive out of the Company's property

any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.  A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

## ARTICLE IX

### Allocations, Income Tax, Distributions, Elections, and Reports

9.01.  <u>Allocations of Losses from Operations.</u>  The Net Losses of the Company for each fiscal year will be allocated proportionate to the Capital Interests.

9.02.  <u>Special Allocations to Capital Accounts.</u>  No allocations of loss, deduction, and/or expenditures described in IRC 705(a)(2)(B) shall be charged to the Capital Accounts of any Member if such allocation would cause such Member to have a Deficit Capital Account.  The amount of the loss, deduction, and/or IRC 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in

25.

accordance with their interests in Company profits pursuant to
Section 9.01 above.

    a.  If any Member unexpectedly receives any
adjustments, allocations, or distributions described in Treas. Reg.
1.704-1(b) (2) (ii) (d) (4), (5), or (6), which create or increase a
Deficit Capital Account of the Member, then items of income and gain
(consisting of a pro rata portion of each item of company income,
including gross income, and gain for such year and, if necessary, for
subsequent years) shall be specially credited to the Capital Account
of the Member in an amount and manner sufficient to eliminate, to the
extent required by the Treasury Regulations, the Deficit Capital
Account so created as quickly as possible.  It is the intent that
this Section 9.02(b) be interpreted to comply with the alternate test
for economics effect set forth in Treas. Reg. 1-704-1(b) (2) (ii)
(d).

    b.  If any Member would have a Deficit Capital
Account at the end of any Company taxable year which is in excess of
the sum of any amount that the Member is obligated to restore to the
Company under Treas. Reg. 1.704-1(b) (2) (ii) (e) and the Member's
share of minimum gain as defined in Treas. Reg. 1.704-2(g)(1) (which
is also treated as an obligation to restore in accordance with Treas.
Reg. 1.704-1(b)(2)(ii)(d), the Capital Account of the Member shall be
specially credited with items of Membership income (including gross

income) and gain in the amount of the excess as quickly as possible.

        c.     Notwithstanding any other provision of this Section 9.02, if there is a net decrease in the Company's minimum gain as defined in Treas. Reg. 1.704(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to the Member's share of the net decrease in company minimum gain.  This Section 9.02(d) is intended to comply with the minimum gain chargeback requirement of Treas. Reg. 1.704-2 and shall be interpreted consistently therewith.  In any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Managers may in their discretion (and shall, if requested to do so by a Member) seek to have the IRS waive the minimum gain chargeback requirement in accordance with Treas. Reg. 1.704-2(f)(4).

        d.     Items of Company loss, deduction, and expenditures described in IRC 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Treas. Reg. 1.704-2(i)

27.

shall be allocated to the Members' Capital Accounts in accordance with Treas. Reg. 1.704-2(j).

       e.     Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Treas. Reg. 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company profit or loss for that period.

       f.     In accordance with IRC 704(c)(1)(A) and Treas. Reg. 1.704-1(b) (2) (i)-(iv), if a member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

       g.     Pursuant to IRC 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in IRC 704(c) (2), the contributing Member shall be treated as recognizing gain or loss from the sale of the property in an amount equal to the gain or loss that would have been allocated to the Member under IRC 704(c)(1)(A) if the property had been sold at its fair market value at the time of the distribution.

h.     In the case of any distribution by the Company to a Member or Economic Interest Owner, the Member or Economic Interest Owner shall be treated as recognizing gain in an amount equal to the lesser of:

i.   The excess (if any) of the fair market value of the property (other than money) received in the distribution over the adjusted basis of the Member's Membership Interest or Economic Interest Owner's Economic Interest in the company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution; or

ii.   The Net Precontribution Gain (as defined in IRC 737(b)) of the Member or Economic Interest Owner.  The Net Precontribution Gain means the net gain (if any) which would have been recognized by the distributee Member or Economic Interest Owner under IRC 704(c)(1)(B) if all property which had been contributed to the Company by the distributee Member or Economic Interest Owner within five years of the distribution, and is held by the Company immediately before the distribution, had been distributed by the Company to another Member or Economic Interest Owner.  If all property which had been contributed to the Company by a

29.

distributee Member or Economic Interest Owner within five years of the distribution and is held by the Company immediately before the distribution, had been distributed to such distributee Member or Economic Interest Owner, then the property shall not be taken into account under this Section 9.02(h) and shall not be taken into account in determining the amount of the Net Precontribution Gain.  If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of the interest is attributable to the property contributed to the entity after such interest had been contributed to the Company.

    i.    In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing member or Economic Interest Owner as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring member or Economic Interest Owner as consideration for an economic interest or Membership Interest, the Capital Accounts of the members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treas. Reg. 1.704-1(b) (2) (iv) (f).  If under Treas. Reg. 1.704-1(b) (2) (iv)

30.

(f), Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of the property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes into account the variation between the adjusted tax basis of such property and its book value.  In the same manner as variations between the adjusted tax basis and the fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under IRC 704(c).

   j.  All recapture of income tax deductions resulting from sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to the recapture was allocated hereunder to the extent that the Member is allocated any gain from the sale or other disposition of the property.

   k.  Any credit or charge to the Capital Accounts of the Members pursuant to Sections 9.02(b), (c), and/or (d), shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.01 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.01 and 9.02 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account

31.

of each member pursuant to the provisions of this Article IX if the special allocations required by Sections 9.02(b), (c), and/or (d), had not occurred.

9.03.   Profits.   The gross operating profit of the Company shall be determined for each fiscal year.  The gross operating profit shall equal the gross revenues of the Company, minus all costs and expenses normally taken into account in determining net income, other than the costs and expenses borne by Straight A and LA pursuant to sections 6.07(a) and (b).

The gross operating profit shall be allocated in the following order of priority:

(i)     first, five percent of net sales as a reserve for profits, to the Members in accordance with their respective Shares of Total Capital;

(ii)    second, to Straight A, in respect of the services provided pursuant to section 6.07(a), an amount equal to 6% of net sales;

(iii)   third, to LA, in respect of the services provided pursuant to section 6.07(b), $546,000;

(iv)    fourth, to Straight A, in respect of the services provided pursuant to section 6.07(a), an amount equal to 2% of net sales;

32.

(v)     fifth, any remaining gross profit shall be allocated 10% to Straight A and 90% to LA.

5.04.  Distributions.  (a) The Company shall pay on a current (weekly) basis the following amounts to the Members:

(i)    to Straight A, an amount equal to 6% of net sales (payable in cash as net sales are accrued under generally accepted accounting principles); and

(ii)   to LA, $10,000 per week (effective as of July 1, 1995), payable by wire transfer of immediately available funds on the first business day of each week, in advance.

(b)     Within 90 days after the end of each fiscal year of the Company, the Members shall endeavor to agree on the financial statements of the Company for such year.  If they are unable to agree within such time period, they shall invoke the arbitration provisions of section 13.15, below.  Promptly after the fi: · .al statements have been agreed to, or promptly after the arbitrator shall have rendered his decision, the Company shall distribute to each Member the undistributed amounts of gross profit for the preceding year allocated in accordance with the allocation priorities set forth in section 9.03.  In the event that the Company shall have distributed to LA during the preceding fiscal year pursuant to section 9.04(a)(ii) an amount in excess of the amount to which it was allocated under section 9.03(b)(i) and (b)(ii), LA shall

33

repay such excess, without interest, to the Company within thirty (30) days after the financial statements have been agreed.

9.05.  Limitation Upon Distributions.  No distribution shall be declared and paid unless, after distribution is made, the assets of the Company are in excess of all liabilities of the Company.

9.06.  Accounting Principles.  The profits and losses of the Company shall be determined in accordance with accounting principles applied on a consistent basis using the accrual method of accounting.  It is intended that the Company will elect those accounting methods that provide the Company with the greatest tax benefits.

9.07.  Interest on and Return of Capital Contributions.  No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for in this Operating Agreement.

9.08.  Loans to Company.  Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

9.09.  Accounting Period.  The Company's accounting period shall be the fiscal year ending June 30.

9.10.  Records. Audits, and Reports.  At the expense of the Company, the Members shall maintain records and accounts of all operations and expenditures of the Company.  At a minimum the Company

34.

shall keep at its principal place of business the following records:

      a.     A current list of the full name and last known business, residence, or mailing address of each Member, Manager and Economic Interest Owner, both past and present:

      b.     A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed.

      c.     Copies of the Company's federal, state, and local income tax returns and reports, if any, for the four most recent years;

      d.     Copies of the Company's currently effective written Operating Agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property, or services, and copies of any financial statements of the Company for the three most recent years;

      e.     Minutes of every special meeting;

      f.     Any written consents obtained from Members for actions taken by Members without a meeting.

    9.11.  <u>Returns and Other Elections.</u>  The Members shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the IRC and all other tax returns deemed necessary and required in each jurisdiction in which the Company does

35.

business.  Copies of those returns, or pertinent information from the returns, shall be furnished to all the Members within a reasonable time after the end of the Company's taxable year.  All elections permitted to be made by the Company under federal or state laws shall be made by the Members.

For tax purposes, each Member and Economic Interest Owner (as defined in Section 10.03 below) which is a nonresident of Delaware shall execute and deliver to the Manager a Delaware Limited Liability Company Nonresident Member Income Tax Agreement (the "Nonresident Tax Agreement") no later than 60 days after becoming a Member or Economic Interest Owner, as the case may be.  The Manager shall timely file with the Delaware Department of Revenue, together with the Company's annual Delaware return, a Nonresident Tax Agreement for each Nonresident Member and Economic Interest Owner.

## ARTICLE X

## Transferability

10.01.  <u>General.</u>  Except as otherwise specifically provided in this Operating Agreement neither a Member nor an Economic Interest Owner shall have the right to:

a.    Sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration, (collectively,

36.

"sell") all or any part of its Membership Interest or Economic Interest;

        b.        Gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy) all or part of its Membership Interest or Economic Interest.

    10.02.   <u>Transferee Not Member in Absence of Unanimous Consent.</u> Notwithstanding anything contained in this Operating Agreement to the contrary, if all of the remaining Members do not approve by unanimous written consent of the proposed sale, gift or assignment (voluntary or involuntary) of a Member's Membership Interest or Economic Interest to a transferee, donee, assignee or creditor of the Member which is not a Member immediately before the sale or gift the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee or donee shall be merely an Economic Interest Owner.  No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer that has not been approved by unanimous written consent of the Members) shall be effective unless and until written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided to the Company and the non-transferring Member(s).

37.

## ARTICLE XI

### Additional Members

11.01.   Admission to Membership.   From the date of the formation of the Company, any Person or Entity acceptable to the Members by their unanimous vote may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Members by their unanimous votes shall determine, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement.

11.02 Financial Adjustments.   No new Members shall be entitled to any retroactive allocation of losses, income, or expense deductions incurred by the Company.  The Members may, at their option, at the time a New Member is admitted, close the Company books (as though the Company's tax year had ended) or make- pro rata allocations of loss, income, and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of IRC 706(d) and the Treasury Regulations promulgated thereunder.

38.

ARTICLE XII

Dissolution and Termination

12.01 Dissolution.

a.     The Company shall be dissolved upon the occurrence of any of the following events:

i.   When the period fixed for the duration of the Company shall expire pursuant to section 2.05 hereof;

ii.   By the unanimous written agreement of all Members; or

iii.   Upon the withdrawal, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member ("Withdrawing Member") or occurrence of any other event which terminates the continued membership of a Member in the Company (a "Withdrawal Event"), unless the business of the Company is continued by the consent of all the remaining Members within 30 days after the Withdrawal Event and the remaining Members offer to purchase the Membership Interest from the Withdrawing Member at a price equal to the Withdrawing Member's Capital Account plus repayment of any outstanding subordinated and/or demand loans due to the "Withdrawing Member".

b.     As soon as possible following the occurrence of any of the events specified in this section 12.01 effecting the

39.

dissolution of the Company, and in the event the Company is not continued by the remaining Members as provided therein, the appropriate representative of the Company shall execute a Certificate of Cancellation to dissolve in such form as shall be prescribed by the Delaware Secretary of State and file same with the Delaware Secretary of State's office.

c.     If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering his property.

d.     Withdrawal of a Member shall be accomplished by written notice delivered to the Company and the other non-Withdrawing Member stating that the Member giving such notice withdraws from the Company, effective as of the day that the non-Withdrawing Member shall give notice of its election to continue the business of the Company or, if the other Member does not so elect within the 30 day period beginning on the day of the notice of withdrawal, upon the winding up of the Company.  From and after the date of such notice until the non-Withdrawing Member shall give notice to the Withdrawing Member, as required by Section 12.01(a)(iii), that it elects to continue the business of the Company, the Withdrawing Member shall

40.

remain a member of the Company and participate in its management and its winding up.

e.    If the non-Withdrawing Member shall elect to continue the business of the Company, and becomes obligated to offer to purchase the Membership Interest of the Withdrawing Partner as provided in paragraph (a), the non-Withdrawing Member shall be deemed to have made such offer on the date that it elects so to continue the business.  The Withdrawing Member may accept such offer at any time within 60 days after the date of such offer.  The closing of the purchase and sale (and repayment of loans and collateral) shall occur at the offices of the Withdrawing Member not more than 10 days after the Withdrawing Member shall have given notice of its acceptance of such offer.  The purchase price and all other amounts due shall be paid in immediately available funds.  In the event that the Members cannot agree on the amount of the purchase price, the undisputed portion of the purchase price shall be paid and the disputed portion shall be paid into an escrow account under the control of counsel to the Members, and the dispute shall be resolved by Arbitration by an accounting firm mutually agreed to by the Members or, if they cannot agree, by an accounting firm selected by the President of the American Institute of Certified Public Accountants.  The fees of the arbitrator shall be shared equally by the parties, or otherwise as the arbitrator may determine.

41.

12.02.  <u>Death of a Manager.</u>  The Company shall maintain life insurance in an amount estimated to be sufficient to fund a buy-out of a Members' share or interest in the Company on the lives of its Managers at the expense of the Company and naming the Company beneficiary thereunder.  Upon the death of a Manager ("Deceased Manager") the Member with whom the Deceased Manager wad affiliated shall offer to sell its Membership Interest to the non-affiliated Member(s) at the Capital Account plus repayment of any outstanding subordinated and/or demand loans as of the date preceding the Manager's death.  If the non-affiliated Member fails to accept such offer by written notice within thirty (30) days after the date of death, the Company shall dissolve.

12.03.  <u>Winding Up. Liquidation. and Distribution of Assets.</u> Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities, and operations, from the date of the last previous accounting until the date of dissolution.  The Members shall immediately proceed to wind up the affairs of the Company.  If the Company is dissolved and its affairs are to be wound up, the Members shall:

a.  Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members may determine to distribute any assets to the Members in kind);

42.

b.      Allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with Article IX above;

c.      Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingencies or liabilities of the Company (for purposes of determining the Capital accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company);

d.      Distribute the remaining assets in the following order:

i.   If any assets of the Company are to be distributed in kind, the net fair market value of those assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members.  Those assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Article IX of this Operating Agreement to reflect such deemed sale.  LA will be assigned the rights to all orders

43.

for which the Company has not purchased raw materials or does not plan to ship (for no monetary consideration).  LA will purchase from the Company any raw materials or supplies that will be used for any of these orders at Company's cost.  The Company's rights under the Adolfo license will, as expeditiously as possible, be reassigned to LA.

ii.  The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Members, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to section 11.03(b)(i).  Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Treas. Reg. 1.704-1(b) (2) (11) (b) (2).

e.   Notwithstanding anything to the contrary in this Operating Agreement upon a liquidation within the meaning of Treas. Reg. 1.704-1(b) (2) (ii) (g), if any Member has a Deficit Capital Account (after giving effect to all contributions, distributors, allocations, and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), the

44.

Member shall have no obligation to make any Capital Contribution, and the negative balance of the Member's Capital Account shall not be considered a debt owed by the Member to the Company or to any other Person for any purpose whatsoever.

   f.    Upon completion of the winding up, liquidation, and distribution of the assets, the Company shall be deemed terminated.

   g.    The Members shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets. Specifically, this Operating Agreement incorporates the distribution provisions of Section 18.804 of the Delaware Act.  Notwithstanding any provision of this Agreement, it is intended that the terms shall comply with the provisions of paragraph 704(b)(2) of the Internal Revenue Code necessary to recognize the membership interests as set forth in section 8.01 of this Agreement.

   12.04.  Certificate of Cancellation.  A Certificate of Cancellation shall be filed in the office of the Delaware Secretary of State to accomplish the cancellation of the Articles of Organization upon the dissolution and the completion of winding up the Company.  Upon dissolution of the Company and until the filing of the Certificate of Cancellation, the persons winding up the Company may, in the name of, and for and on behalf of, the Company, prosecute

45.

and defend suits, whether civil, criminal or administrative, gradually settle and close the Company's business, dispose of and convey the Company's property, discharge or make reasonable provision for the Company's liabilities and distribute to the Members any remaining assets of the Company, all without affecting the liability of Members and Managers and without imposing liability on a liquidating trustee.

   12.05.  <u>Return of Contribution/Nonrecourse to Other Members.</u>
Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, the remaining assets shall be distributed pursuant to section 8.02(e) hereof, and the Members shall have no recourse against any other Member.

   12.06.  <u>Disposition of Adolfo License.</u>  Notwithstanding anything in this Agreement to the contrary, including, without limitation, Sections 12.01(a)(iii), 12.03(a) and 12.03(d), upon the withdrawal, retirement, resignation, expulsion, bankruptcy or dissolution of LA, or upon the death of the Manager affiliated with LA, the Company shall assign to LA or its successors and assigns all of the Company's right, title and interest in, to and under any license or licenses

46.

for the ADOLFO trademark.  For all purposes of this Agreement, the
fair market value of all such right, title and interest of the
Company shall be zero, it being the intention of the Members that in
the event that the business of the Company shall be continued by
Straight A after the withdrawal of LA, the ADOLFO license shall
revert to LA and the price to be paid to LA in respect of its
Membership Interest shall not be reduced by any amount to reflect
such reversion.  Notwithstanding the preceding provisions of this
Section 12.06, in the event the ADOLFO license is required to be
assigned to LA, the Company shall be granted a license (on the same
terms as the then existing license) by LA for a reasonable period of
time to sell off items in inventory or for which the Company has
committed for raw materials.

## ARTICLE XIII

### Miscellaneous Provisions

13.01.  <u>Notices.</u>  Any notice, demand, or communication required
or permitted to be given by any provision of this Operating Agreement
shall be deemed to have been sufficiently given or served for all
purposes if delivered personally to the party or to an executive
officer of the party to whom the same is directed or, if sent by
registered or certified mail, postage and charges prepaid, addressed

47.

to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement Except as otherwise provided in this Operating Agreement, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

13.02.  <u>Books of Accounts and Records.</u>  Proper and complete records and books of account shall be kept or shall be caused to be kept by the Members in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in the detail and completeness customary and usual for businesses of the type engaged in by the Company. The books and records shall be maintained as provided in section 8.10 above.  The books and records shall at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, Economic Interest Owners, or their duly authorized representatives during reasonable business hours.

13.03.  <u>Applicability of Delaware Law.</u>  This Operating Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Delaware, and specifically the Delaware Act.

13.04.  <u>Waiver of Action for Partition.</u>  Each Member and Economic Interest Owner irrevocably waives during the term of the

48.

Company any right that it may have to maintain any action for partition with respect to the property of the Company, provided, however, that any Member may at any time, in its sole and absolute discretion, without liability to the Company or any other Member, withdraw from the Company, whereupon the provisions of Article XII shall become applicable.

13.05.  <u>Amendments.</u>  This Operating Agreement may not be amended except by the unanimous written agreement of all of the Members.

13.06.  <u>Execution of Additional Instruments.</u>  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney, and other instruments necessary to comply with any laws, rules, or regulations.

13.07.  <u>Construction.</u>  Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.08.  <u>Heads.</u>  The headings in this Operating Agreement are for convenience and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any of its provisions.

13.09.  <u>Waivers.</u>  The failure of any party to seek redress for violation of or to upon the strict performance of any covenant or condition of this Operating Agreement not prevent a subsequent act,

49.

---

that would have originally constituted a violation, from having the effect of an original violation.

13.10.   <u>Rights and Remedies Cumulative.</u>   The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right' or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

13.11.   <u>Severability.</u>   If any provision of this Operating Agreement or its application to any person or circumstance shall be invalid, illegal, or unenforceable to any extent, the remainder of this Operating Agreement and its application shall not he affected and shall be enforceable to the fullest extent permitted by law.

13.12.   <u>Heirs, Successors, and Assigns.</u>   Each and all of the covenants, terms, provisions, and agreements contained in this Operating Agreement shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors, and assigns.

13.13.   <u>Creditors.</u>   None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

50.

13.14.   <u>Counterparts.</u>   This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.15.   <u>Arbitration.</u>   Without limiting the ability of a Member to give a notice of withdrawal at any time, the Members agree to submit to binding arbitration in accordance with this Section any issue relating to the operations of the Company as to which they cannot agree.   Either Member may refer an issue to arbitration after it shall have given written notice to the other that the issue will be submitted to arbitration unless the issue has been resolved within a period of not less than ten (10) days from the date of the notice. Except in cases where the issue to be resolved involves a transaction with an affiliate of Straight A, or the interpretation of the Operating Agreement, or a matter within the competence of LA as set forth in Section 6.07(b), until the earlier of (x) Straight A shall have received cumulative net distributions, loan repayments and releases of collateral aggregating $500,000, or (y) either Straight A or LA has given a notice of withdrawal or the Company has dissolved, the sole arbitrator shall be Myer Alperin.   When Myer Alperin is not the arbitrator, the arbitrator shall be any person acceptable to both Members, provided, that if the Members are unable to agree on an arbitrator within ten (10) days after the need for such agreement shall have arisen, the arbitrator shall be selected in accordance

51.

with the rules of the American Arbitration Association.

    13.16.  <u>Integration.</u>  There are no other agreements or understandings relating to the operation of the Company that are not expressed in this written Operating Agreement and, to that extent, this Agreement embodies the entire understanding of the parties and supersedes all prior arrangements.

<u>CERTIFICATE</u>

    The undersigned hereby agree, acknowledge, and certify that the foregoing Operating Agreement, consisting of 52 pages and Exhibit "A", constitutes the Operating Agreement of Concorde Apparel Company, L.L.C.  adopted by the Members of the Company as of August 25, 1994.

STRAIGHT A COMPANY, A
LIMITED PARTNERSHIP

ATTEST:

BY: ALL-STAR INDUSTRIES,
INC., ITS CORPORATE GENERAL
PARTNER

BY _____
   James L. Alperin
   Secretary

BY _____
   Irwin E. Alperin
   President

ATTEST:

LA APPAREL, INC.

BY _____

BY _____
   Lee Wattenberg, President

52.

## EXHIBIT "A"

| Sales and Marketing Expenses and Responsibilities | Sourcing, Shipping and Administrative Expenses and Responsibilities | Purchasing and Production Expenses and Responsibilities | Corporate Expenses and Responsibilities |
|---|---|---|---|
| **LA APPAREL** | **STRAIGHT A** | **JOINT** | **JOINT** |
| Merchandising | Accounting and Bookkeeping | Design | Royalties |
| Styling | MIS and Update | Q.C. | Factoring |
| Sales and Marketing | Credit and Charge-back Management | Patternmaking | Finance |
| Trade Shows | Invoicing | Markers | Insurance Liability, Credit |
| Showroom Expenses | Customer Service | Piecegoods | Professional Fees |
| Travel | Packing and Shipping Materials | Trim/Labels | Corporate Supplies/ Non-Shipping |
| Front End Depreciation | Picking and Packing | Ticket Making | Communications (Tie Lines) |
| Sales Commission | Order Purchasing | Cutting | Freight Out |
| Selling and Ref Swatches | Allocation | Freight In | Profit |
| Sample Expense | All B/E Forms | Pressing | Taxes |
| Salaries and Benefits | Back Office Administration | Production | |
| | Warehouse and Administration | Production Travel/ Entertainment | |
| | Office Expense Depreciation | Contract Sewing | |