# EXHIBIT 4

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL
------------------------------------------------------------------X

STRAIGHT A COMPANY, LP,

                      Claimant,                  Case No. 01-19-0004-6511

   -against-

LA APPAREL, INC.,

                      Respondent.

------------------------------------------------------------------X

**FINAL AWARD ON THE MERITS IN FAVOR OF RESPONDENT, LA APPAREL, INC.**

**Preliminary Statement**

I, THE UNDERSIGNED ARBITRATOR, having been duly designated in accordance with the arbitration agreement entered into between the parties, dated August 25, 1994, having been duly sworn and having heard the allegations and proofs of the Parties, hereby issue this Award respecting the merits of the parties' dispute.

This Award is issued after a three-day telephonic "Zoom" hearing, conducted on October 13, 14 and 15, 2020, and after the submission of comprehensive post-hearing briefs. The transcribed hearing record is over 700 pages in length, includes the testimony of three witnesses and the admission of approximately 41 documents, many of which were multi-page in length. Each party was ably represented by capable and zealous counsel throughout these proceedings. Claimant was represented by Thomas Filardo and Maxwell J. Rubin of Warshaw Burstein, LLP. Respondent was represented by Stuart D. Serota and Jed R. Schlacter, of Kaufman & Serota P.C. and Schlacter & Associates, respectively. This Award is based on my evaluation of the evidentiary record, counsel's arguments and my determination of the applicable legal standards governing this matter.[1]

---

[1] The parties requested a Reasoned Award rather than lengthier findings of fact and conclusions of law. While there were a variety of additional facts developed at the hearing, the matters outlined herein describe in summary form the record evidence, proven facts and basis for my Award.

### The Parties

This is a commercial matter filed pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"). At the time giving rise to the claims at bar, the parties were each equal members ("Members") of a Delaware limited liability company, Concorde Apparel Company L.L.C. ("Concorde"). It was created for the purpose of engaging in the business of styling and marketing men's clothing products, including suits, sportscoats, overcoats, raincoats and other apparel as agreed to by the Members.

The duties of Concorde's Members are reflected in their Operating Agreement. *See* Ex. C-1(the "Operating Agreement"), at § 6.07 and Ex. "A" to their Operating Agreement. In addition to various joint duties, Claimant, Straight A Company, L.P. ("Straight A"), was responsible for accounting and bookkeeping services, MIS duties, accounting for credit and charge backs management, invoicing, packing and shipping materials, picking and packing, order purchasing allocation, warehouse and administration and office expense administration. *Id*. Respondent, LA Apparel, Inc. ("LA Apparel"), was responsible for merchandising, styling, sales and marketing, trade shows, showroom expenses, travel, front end depreciation, sales commissions, selling and ref swatches, sample expense and salaries and benefits. *See* Ex. "A" to Operating Agreement.

The parties frequently referred to themselves as being at the "Front End" or "Back End" of Concorde's business, with LA Apparel occupying the "Front End" and Straight A being the "Back End." Straight A's principal, James Alperin ("Mr. Alperin"), participated in the hearing, as did LA Apparel's principal, Lee Wattenberg ("Mr. Wattenberg").

### The Operating Agreement

The Concorde Operating Agreement, dated as of August 25, 1994, has a number of provisions relevant to this dispute.

*First*, as noted above, the Operating Agreement provides for binding arbitration of disputes pursuant to the rules of the American Arbitration Association ("AAA"). Ex. C 1 at § 13.15.

*Second*, the Operating Agreement recognizes the different commitments that the parties each had to Concorde. Specifically, each Member was required to operate the business "to the best of their ability" and to "devote sufficient time and energy to the operation of the Company to cause it to operate effectively." (Operating Agreement, § 5.01) LA Apparel was required to "devote substantially all" of its "business time and attention to the management of the Company." Straight A, on the other hand, was allowed to continue to be "engaged in other apparel manufacturing activities and businesses and shall continue to be authorized to do so." Operating Agreement, § 5.05.

Straight A's other business activities have a bearing on this matter. In particular, in addition to owning Straight A, Mr. Alperin owned and/or had an interest in a number of other entities, one of which was Astro Apparel, Inc. ("Astro"). Mr. Alperin viewed Astro as a "hub" and Straight A

2

as one of a number of the "spokes" which Astro serviced and which financially supported Astro's operations. Mr. Alperin's objective was to have payments made by Astro's "spokes" cover its expenses.

*Third*, the Operating Agreement provides a formula (the "Waterfall") for the allocation of Concorde's gross operating profit in the following order of priority:

1. Five percent (5%) of net sales as a reserve for profits, to be paid to the Members in proportion to their respective Capital shares of Total Capital (*i.e.* 50% to each);

2. Six percent (6%) of net sales to Straight A;

3. Payment of $546,000 per year to LA Apparel;

4. Two percent (2%) of net sales to Straight A; and

5. Any remaining gross profit to allocated ten percent (10%) to Straight A and ninety percent (90%) to LA Apparel.

*See* Operating Agreement, § 9.03(i)-(v).

*Fourth*, in language that goes to the heart of this dispute, the Operating Agreement requires that all amendments be in writing. It provides that the agreement "may not be amended except by the *unanimous written agreement* of all of the Members." *Id.*, at § 13.05 (emphasis added). It further provides that:

> Waivers. The failure of any party to seek redress for violation of or to [sic] upon the strict performance of any covenant or condition of this Operating Agreement [sic] not prevent a subsequent act, that would have originally constituted a violation, from having the effect of an original violation.

*See* Operating Agreement, § 13.09.

*Fifth*, the parties agree that the Operating Agreement requires that each of Concorde's Members execute checks for withdrawals from Concorde's bank accounts, as is necessary to distribute the company's gross operating profits. *See* Operating Agreement, § 5.06. This means that either Member can effectively veto the intended distribution of gross operating profits by failing to consent to their distribution. This triggers an obligation to file an arbitration demand, as occurred here, albeit well beyond the time frame provided by the Operating Agreement, § 9.04(b).

*Last*, the Operating Agreement is governed by Delaware Law. Operating Agreement, § 13.03.

**Facts**

While there were many hotly contested issues, some matters are not in serious dispute. Chief among the undisputed matters is that, for fiscal year 1997, the parties first decided to distribute Concorde's gross operating profit in a manner which differed from the Waterfall provisions of section 9.03 of the Operating Agreement. In that year, the parties developed a new method to calculate the distribution of gross operating profits (the "New Baseline"), as follows:

1. Five percent (5%) of net sales as a reserve for profits, paid to the Members in proportion to their respective Capital shares of Concorde (i.e. 50% to each);

2. Straight A received the higher of (a) six percent (6%) of adjusted net sales, or (b) forty-four and a half percent (44.5%) of what was termed the "profit distribution pool"; and

3. LA Apparel would receive either (a) fifty-five and a half percent (55.5%) of the profit distribution pool, *or* (b) if Straight A's 6% of adjusted net sales exceeded the forty-four and a half percent (44.5%) figure, then LA Apparel would receive the balance left over in the profit distribution pool after Straight A received its six percent (6%) of adjusted net sales from that distribution pool.

The parties do not dispute that the foregoing reflects the New Baseline. They do, however, contest its continuing applicability.

The New Baseline formula was used regularly for 17 years, without deviation, contest or dispute until 2015. For the three-year period of 2015, 2016 and 2017, the New Baseline was still used by the parties, but only as the starting point for negotiations regarding the distribution of gross operating profits, with modest "tweaks" sought by Straight A (because of Astro's asserted cash requirements) and, through negotiation, agreed to by LA Apparel. In 2018 and again in 2019, LA Apparel sought continued distribution pursuant to the New Baseline, while Straight A sought to revert to the Waterfall, as provided for in the Operating Agreement. Thus, from 1998 – 2017 the distribution of gross operating profits was made pursuant to the New Baseline, albeit with some modest modifications for the last three years, 2105, 2016 and 2017. Said differently, payments pursuant to the Waterfall were *never* made after 1997; payments pursuant to the New Baseline were made regularly and without objection or deviation for 17 years from 1997 – 2014. Thereafter, from 2105 – 2017 the New Baseline was used as the starting point for negotiations and resulted in annually negotiated modifications to it.

When presented with the financial statements for 2018 and again for 2019, Mr. Wattenberg objected to the continued use of the New Baseline. He refused to "sign off" on the financial statements, as required by section 9.04(b) of the Operating Agreement. This precluded distribution of gross operating profits to the Members and ultimately resulted in the filing of Straight A's Demand For Arbitration.

**The Parties' Contentions**

*Straight A's Claims*

Straight A's two count Statement Of Claim ("SOC") asserts claims for (i) breach of contract, arising from Mr. Wattenberg's refusal to authorize Concorde's distribution of gross operating profits for 2018 and 2019 pursuant to the Waterfall provision of the Operating Agreement (SOC, ¶¶ 27 – 31); and (ii) breach of the covenant of good faith and fair dealing for Mr. Wattenberg's refusal to authorize the checks required in order for Concorde to make payments to its Members pursuant to the Waterfall provisions of the Operating Agreement. (SOC, ¶¶ 32 – 36).

Straight A argues that the parties' conduct in making payment pursuant to the New Baseline did not amount to an unsigned amendment/modification to their Operating Agreement. It argues that it never waived its right to insist upon payment pursuant to Waterfall. Indeed, it asserts that Mr. Alperin repeatedly told Mr. Wattenberg that Straight A did not abandon the Waterfall, even as it consented annually to the allocation of gross operating profits pursuant to the New Baseline. Straight A also argues that there was no consideration for the alleged amendment to the Operating Agreement and that, in any event, Delaware's statute of frauds bars LA Apparel's claim of a modification to the Operating Agreement.

*LA Apparel's Affirmative Defense*

LA Apparel does not dispute that Mr. Wattenberg refused to authorize the distribution of gross operating profits in years 2018 and 2019 pursuant to the Waterfall provisions of the Operating Agreement. Instead, its defense centers on the parties' conduct. It asserts, as an affirmative defense that the consistent, uniform manner by which the parties allocated Concorde's gross operating profit for 17 years reflects an amendment to the Operating Agreement such that the New Baseline accurately describes the proper calculation to follow in making distributions in 2018 and 2019 to Concorde's Members. Its Answer seeks a determination that the Operating Agreement was modified by the New Baseline and distribution of profits pursuant to it. *See* Answer, ¶ 35 and WHEREFORE clause.

**Legal Standard**

The key question presented is whether the parties' conduct manifests an intent to abandon the Waterfall method of distributing gross operating profits in favor of the New Baseline. This raises a number of subsidiary issues, especially because there is no formal written amendment to the Operating Agreement and because, as noted above, the Operating Agreement provides that it cannot be amended except by the "*unanimous written agreement* of all of the Members." Ex. C 1, at § 13.05. In addition, the Operating Agreement further provides, as noted, that waiver will not be found by virtue of a party's prior "failure to seek redress for violation" of the Agreement or to insist upon the "strict performance" of the Operating Agreement. *Id.*, at § 13.09.

Notwithstanding a written prohibition against oral modifications and amendment by conduct, Delaware permits claims that "irrespective of a clear contractual provision requiring that waivers or modifications be made in writing, a waiver or modification [can be] effected by oral statements or conduct." *EUREKA VIII v. Niagara Falls Holdings*, LLC, 899 A.2d 95, 109-110 (Del. Ch. 2006). Relying on *EUREKA*, a District Court in Delaware noted that "Delaware law allows a no oral waiver provision to be waived by oral statements or conduct." *Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 738 (D. Del. 2016).

Any such amendment is not be easily proven. Delaware requires strict proof of such amendments with "*specificity* and *directness* as to leave *no doubt* of the intention of the parties to change what they previously solemnized by formal document." *Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) quoting *Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del. Supr. 1979) (emphasis added). *See also Reserves Dev. LLC v. Severn Sav. Bank*, 2007 Del. Ch. LEXIS 156 at * 28-29 (Del. Ch. Nov. 9, 2007), citing *Reeder* and *Continental*.

The parties do not dispute that proof of such an amendment must rise to the level of clear and convincing evidence. *See* Claimant Straight A Company, LP's Post Hearing Memorandum of Law (Claimant's Brief"), at 18-22; Respondent's Post-Hearing Memorandum ("Respondent's Brief"), at 31-33. (Tr. 4-8 (Claimant's opening); 16-17 (Respondent's opening)). That heavy burden can only be met by evidence proving that "something is highly probably, reasonably certain, and free from serious doubt." *See* Delaware Pattern Jury Instructions, § 4.3. *Accord Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002).

Thus, the primary issue for resolution, as framed by the Delaware Pattern Jury Instructions and informed by Delaware case law, is whether LA Apparel's claim of an unwritten modification/amendment to the Operating Agreement is proven by clear and convincing evidence, *i.e.*, proofs that are "highly probable, reasonably certain and free from serious doubt" (*id.*) and which contain a "specificity and directness" to prove that the parties intended to "change what they previously solemnized by a formal document." *Continental Ins. Co. v. Rutledge & Co., supra.* For the reasons that follow, I find that LA Apparel has met this heavy burden.

**Analysis**

This case focuses on whether the parties' conduct demonstrates, with the specificity, probability and directness required by Delaware law, that there is no doubt that the parties intended to abandon the Waterfall method of distributing Concorde's gross operating profits in favor of the New Baseline. A chronological review of the parties' relationship places this analysis in context.

*Early Years (1994-1997)*

The manner in which the parties distributed their gross operating profits during this period is undisputed. As noted, from the execution of the Operating Agreement as of August, 1994 through 1997, the parties followed the Waterfall provisions of the Operating Agreement.

*The Admitted 1997 Amendment*

In 1997, Paul Wattenberg (the now deceased father of Mr. Wattenberg) and Mr. Wattenberg approached Mr. Alperin. They advised of an opportunity to hire several sales representatives from the Syms family. As Mr. Alperin recollected, Straight A needed "some salary, supplemental support," as the money available through the Waterfall was insufficient to support this growth opportunity. Mr. Alperin testified that "I agreed that we would try out a new formula and we spent three or four hours, I mean it was an exhausting [afternoon]…" (Tr. 372). Mr. Alperin continued: "…*that is when we established this formula. It became a baseline formula.* It has been the formula that was used for negotiations every year and there were *always* year-to-year negotiations" (Tr. 373-374) (emphasis added). Mr. Alperin continued: "…that was the baseline formula that was established and except for the fact *that I always reserved my right to go back to the Operating Agreement* if things weren't working out for me, *we used that new formula by mutual agreement on a year-to-year basis.*" (Tr. 374) (emphasis added).

In short, Mr. Alperin acknowledged that the parties adopted a "new formula," but asserted that there were "always year-to-year negotiations" regarding which formula to use in allocating gross operating profits. He asserted that he "always reserved" his "right to go back to the Operating Agreement." This effectively frames the issue for disposition.

To resolve it, I consider the parties' conduct and their contemporaneous writings to determine their shared intent. As noted, the issue is whether the New Baseline was intended to forever supplant the Waterfall or whether the New Baseline was merely a year-to-year accommodation provided LA Apparel by Mr. Alperin who "always" reserved his rights. This inquiry is aided by a review of the parties' emails, particularly because Mr. Alperin twice testified on re-direct that, at some unspecified date likely in the early 2000s (Tr. 567-569), he used emails to "*document everything*" (Tr. 566) (emphasis added). He continued:

> I would say that at a certain point I wanted to use – you know, I wanted to *document everything* and – to me, the documentation and the follow-up that's involved, the technology from follow-up and documentation is so powerful that it compelled me to want to try to avoid doing anything but by email, unless something needed to be discussed or negotiated.

Tr. 567-568 (emphasis added). Mr. Alperin then testified that Mr. Wattenberg "probably gets over a hundred emails a day from me now." Tr. 568.

*Middle Years (1998-2014)*

Even allowing for some hyperbole by Mr. Alperin that he "*always* reserved" his "right to go back to the Operating Agreement" (Tr. 374) and that he wanted to "document *everything*" with Mr. Wattenberg (Tr. 566 and 568), there is a noticeable lack of documentary evidence supporting Straight A's claims. Indeed, Mr. Alperin regularly used the New Baseline to reflect the parties' contemplated allocation of gross operating profits in internal documents provided to Mr. Wattenberg. According to Mr. Alperin, he "never" reflected the Waterfall in any documents provided to Mr. Wattenberg during a 20 year period. (Tr. 511-512) And when the parties, in

2011, were considering the potential acquisition of a third party, Neema, Mr. Alperin represented to the seller's agent that Concorde allocated its profits in a manner consistent with the New Baseline. *See* Ex. R 2 and Tr. 493-497. These writings of Mr. Alperin strongly suggest that the parties intended to amend and modify the provisions of the Operating Agreement such that the Waterfall no longer reflected the agreed upon manner of allocating gross operating profits.

For example, from 1998-2015 when performing its "accounting and bookkeeping services" for Concord (Ex. C 1 at, Ex. "A"), Mr. Alperin prepared both *monthly* (Tr. 190-191) and *annual* (R 1; Tr. 474-475) financial statements based exclusively on the New Baseline. (Tr. 56) Mr. Alperin testified on cross-examination that, over a 20 year period, he *never once* presented Mr. Wattenberg with financial statements reflecting the Waterfall allocation – only the New Baseline:

> Q: Isn't it a fact that from 1997 through 2017 you *never* presented Lee [Wattenberg] with a formula for the distribution of profits that went according to the waterfall in the operating agreement?
>
> A: *That's a fact.*
>
> Q: And every one that you presented to Lee [Wattenberg], in all of those internal financials had the [new] baseline formula through 2017, correct?
>
> A: *That is correct.*

Tr. 511-512 (emphasis added).

This is generally consistent with what I find to be the parties' course of conduct, as reflected in their email communication. For example, in an April 20, 2006 email (Ex. R 4), Mr. Alperin wrote to Mr. Wattenberg acknowledging that the Operating Agreement "has been renegotiated several times" resulting in additional payments to the "front end" for "payment for salaries and commissions for salesmen[2], office administration, etc." In the same email, Mr. Alperin recognized that LA Apparel's effort "is driving the business." He also "doubt[ed] very much that we could find a better partner." This confirms not only the existence of the amendment to the Operating Agreement, but also its basis.[3]

Similarly, in a pair of 2008 emails sent to Mr. Wattenberg by Mr. Alperin[4], Mr. Alperin (i) noted that LA Apparel had accepted additional responsibilities in exchange for a more generous

---

[2] This is consistent with the fact that the New Baseline was established in 1997 because Straight A required additional funds to hire sales representatives from the Syms family, as was required to support continued revenue growth. *See supra*, at p. 7.
[3] Notably, the exhibit separately asserts an "CONTRACTUAL right" to ship directly from Mr. Alperin's "hub," Astro, but does not similarly claim any contractual right to revert back to the Waterfall provision of the Operating Agreement. (Caps in original)
[4] *See* Ex. R 14 and C 39, respectively.

allocation ("the reason Astro gets 6% (not the 8% in the agreement) is because you have chosen to be responsible for the details of production control"); and (ii) restated a portion of the New Baseline formula (the 44.5% of gross profits portion) and stating a "willingness to review things after we see the results..." This statement is made without reference to any right to impose the Waterfall or any reservation of rights.

Likewise, in emails dated June and December 2009 (combined as Ex. C 40), Mr. Alperin objected to certain of the elements of the New Baseline, specifically the 6% guaranty, but never suggested that he wasn't bound by it or that he had the right to revert back to the Waterfall provisions of the Operating Agreement.

And as noted above, Mr. Alperin acknowledged the New Baseline when emailing Neema's representative in 2011.

*Last Years (2015 2019)*

The parties' relationship was marked by increasing friction during this period. In August, 2015, Mr. Alperin pushed for a greater allocation than was available under the New Baseline and asserted the right to "revert to the compensation formula as agreed to in our original August 25, 1994 Operating Agreement and beyond." He claimed that Straight A had "for several years" indicated that variances from the Waterfall were mere "'accommodations' [that] I have historically been willing to make..." *See* Ex. C 20, dated August 12, 2015.

Similar communications between the parties followed during this period, but the parties *never* reverted back to the Waterfall. Rather, for the years 2015, 2016 and 2017 the New Baseline served as a *starting point* for negotiations which resulted in modest adjustments to it, each somewhat different than the one before. But the critical fact is that the parties' negotiations *started* with the New Baseline.

*Eric Davis, CPA*

In addition to Messrs. Alperin and Wattenberg, each of whom testified, Claimant also called Eric Davis ("Mr. Davis") as a witness. Mr. Davis is a CPA and a member of the Ginader, Jones & Co. ("Ginader") firm, which provided certain services to both Concorde and other entities in which Mr. Alperin has an interest. Pursuant to my April 27 Scheduling Order, the Ginader firm was the subject of pre-hearing document production.

While Mr. Davis' testimony generally favored Mr. Alperin's recollection that the parties negotiated their profit allocation every year, Mr. Davis did not have documents reflecting this asserted fact. More specifically, Mr. Davis did not have documentary proof reflecting Mr. Alperin's claim that Straight A provided LA Apparel with an annual, negotiated accommodation that repeatedly resulted in distribution through the New Baseline, as compared to an oral amendment, reflected by conduct, pursuant to which the parties changed their Operating Agreement and allocated profits pursuant to the New Baseline. In fact, Mr. Davis recollected that "...the first year we did the work, the allocation was different from what was in the Operating Agreement." (Tr. 350). That did not change. The lack of corroborating documents in

9

Mr. Davis' possession, particularly in the critical 1997 - 2015 time frame, is telling – all the more so because Mr. Alperin "documents everything" (Tr. 566). This supports my finding that the parties modified their Operating Agreement in the manner alleged by LA Apparel.

**Conclusion**

Based on the foregoing, I find by clear and convincing evidence that the parties first amended their Operating Agreement in 1997 by agreeing to allocate profits through the New Baseline, rather than through the Waterfall provisions of the Operating Agreement. This is proven by the evidentiary gold standard *i.e.,* corroborating contemporaneous proof, much of it from Mr. Alperin himself. In reaching this conclusion, I am particularly struck by the (i) uninterrupted 17 year of conduct reflecting the parties' intent; (ii) monthly and annual financial reports, issued by Mr. Alperin without reservation of rights, reflecting the consistent use of the New Baseline (Tr. 511-512); (iii) Mr. Alperin's written representation to a third party, Neema, respecting the allocation of profits (R 2); (iv) credible oral testimony regarding the parties' business relationship and the manner in which they decided to allocate profits; and (v) lack of contemporaneous documentary evidence from Straight A respecting its assertion that there were "always year-to-year negotiations" (Tr. 373-374), especially because Mr. Alperin took pains to "document everything." (Tr. 566) If Mr. Alperin actually reserved his rights to maintain the Waterfall on a consistent basis and participated in annual negotiations regarding the allocation of profits, there would be significant contemporaneous documentary evidence of this fact. It is of controlling significance that such evidence does not exist. Indeed, it was not until August, 2015 (C 20), well *after* the parties' Baseline amendment was in place and well established that, in an apparent effort to "turn back the clock" and negate almost two decades of conduct, Straight A asserted its claimed right to use the Waterfall. This was far too little and, more importantly, far too late. In sum, the clear and convincing evidence proves an intent by the parties to amend their Operating Agreement. The entirety of the evidentiary record proves that the parties amended and modified the provisions of the Operating Agreement by replacing the Waterfall with the New Baseline, such that the Waterfall no longer reflected the intended manner of allocating Concorde's gross operating profits.[5]

---

[5] Straight A also asserts that the amendment fails for lack of consideration or that its proof is barred by the Statute of Frauds. I disagree. As to consideration, LA Apparel remained a Member of Concorde because Straight A acceded to the New Baseline (Tr. 146), thereby foregoing its right to withdraw and continuing its efforts on behalf of Concorde. This qualifies as sufficient consideration. Notably, this benefitted Straight A because it earned profit allocations in excess of what it otherwise would have received. (Tr. 149; *see also* Ex. R 4 (acknowledging that Straight A "is driving the business")). Moreover, LA Apparel used the additional allocation to incentivize the sales force (Tr. 148), including hiring members of the Syms family to drive sales.

As to the Statute of Frauds, I note that this issue was first raised post-hearing and that it was not mentioned in Straight A's pre-hearing memorandum or its opening statement. That said, Mr. Alperin's own multiple emails, admittedly sent on behalf of Straight A, including those essentially acknowledging the nature and existence of the amendment (Tr. 511-512) coupled

## Award

I find that § 9.03 of the Operating Agreement was amended such that the New Baseline reflects the manner by which the parties intended to allocate their gross operating profits. As noted, the parties' gross operating profits for years 2018 and 2019 have not been distributed because of the parties' disputes. My Award, therefore, orders and directs the parties to distribute their 2018 and 2019 gross operating profits (and all profits subsequent to 2019) pursuant to the New Baseline, *i.e.*, granting the relief sought in ¶ 35 and in the WHEREFORE of Respondent's Answer, except as to the request for an award of costs and disbursements.

In addition, AAA filing fees totaling $10,500.00 and the Arbitrator's compensation totaling $24,795.00, shall be shared evenly between the parties, such that Respondent shall reimburse Claimant the sum of $16,522.50.

Any claims or defenses not directly addressed herein are DENIED.

IT IS SO ORDERED.

Date: January 5, 2021                                          George J. Krueger, Arbitrator

---

with LA Apparel's reliance on the amendment, satisfy Delaware's statute of frauds. *Olson v. Halverson*, 982 A. 2d 286, 293-94 (Del. Ch. 2008), *aff'd*, 986 A. 2d 1150 (Del. 2009). *See also Urban Green Technologies, LLC v. Sustainable Strategies, 2050 LLC*, No. N13C-12-115 CLS (Del. Superior Court), February 8, 2017(statute of frauds is inapplicable where writings exist).

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL

In the Matter of the Arbitration between:

Case Number: 01-19-0004-6511

Straight A Company, LP     Claimant

-vs-

LA Apparel, Inc.           Respondent

## DISPOSITION FOR APPLICATION OF MODIFICATION OF AWARD

I THE UNDERSIGNED ARBITRATOR having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated August 25, 1994, and having been duly sworn, and having heard the proofs and allegations of the Parties, and having previously rendered an Award dated January 5, 2021 (the "Award"), and Respondent having filed an application for Modification pursuant to Rule 50 of the Rules of the American Arbitration Association, and Claimant having responded by letter dated January 29, 2021, do hereby, GRANT the Respondent's application for Modification in the following manner only:

The second paragraph of page 11 of the Award is stricken and, based on a payment from Respondent to Claimant in the amount of $13,005.00, the following paragraph is substituted in its place:

"In addition, AAA filing fees totaling $10,500.00 and the Arbitrator's compensation totaling $24,795.00, shall be shared evenly between the parties, such that Respondent shall reimburse Claimant the sum of $3,517.50."

In all other respects, the Award dated January 5, 2021, is reaffirmed and remains in full force and effect.

_____ Date: February 2, 2021

George J. Krueger, Arbitrator

I, George J. Krueger, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Disposition for Application of Modification of Award.

_____ Date: February 2, 2021

George J. Krueger, Arbitrator